[S. F. No. 5615. Department One.—March 13, 1911.]

In the Matter of the Estate and Guardianship of BENNETT WOOD, a Minor. WM. R. TAYLOR, Guardian, Appellant, BENNETT WOOD, Respondent.

GUARDIAN AND WARD—INVESTMENTS OF FUNDS BY GUARDIAN—ACTION OF GUARDIANSHIP COURT.—The only action of the guardianship court which will protect a guardian in the matter of the investment of the funds of the ward, must be action had under such circumstances as show a bringing of such matter by the guardian to the attention of the court for an adjudication thereon.

ID.—ORDERS FOR WITHDRAWAL OF SMALL SUMS FOR SUPPORT OF WARDS—RATIFICATION OF INVESTMENT NOT IMPLIED.—Orders made by the guardianship court, from time to time, for the withdrawal of funds from the possession of the administrator for the support of the wards do not indicate any knowledge on the part of the court that the guardian had made any permanent deposit of the funds, nor imply any ratification of the same or of the mode of the control thereof.

ID.—MEASURE OF CARE AND SKILL REQUIRED OF GUARDIAN.—The measure of care and skill required of a guardian or similar trustee is such as would be exercised by a man of ordinary prudence and skill in the management of his own business.

ID.—RULE AS TO TEMPORARY DEPOSIT OF TRUST FUNDS IN BANK FOR SAFE KEEPING—NECESSITY OF EARMARKING DEPOSIT—FAILURE OF BANK.—The necessity of temporarily depositing trust funds in a bank for safe keeping is recognized, and if a trustee, for the purposes of such temporary deposit, exercises the degree of care and skill stated in the selection of a bank, and so earmarks the deposit as to show its trust character, he is not responsible for the failure of the bank; but if he deposits the money in his individual real name, without any designation or indication of his representative character, he is generally liable in the event of loss through the failure of the bank, notwithstanding he has not been guilty of any negligence.

ID.—PERMANENT INVESTMENT WITHOUT ORDER OF COURT—LOAN TO BANK ON PERSONAL SECURITY—LOSS FROM FAILURE—WANT OF DUE CARE—LIABILITY OF GUARDIAN.—In the absence of an order of court permitting it, a deposit by the guardian of the funds of his ward in a bank for permanent investment is, in effect, a loan to the bank on personal security only, which is not a proper exercise of due care. In such case, the guardian is liable to make good the loss of such permanent investment as the result of the failure of the bank.

ID.—RELINQUISHMENT OF CONTROL OF INVESTMENT TO SURETY OF GUAR-
DIAN—GUARANTOR OF FUND—MOTIVE AND CAUSE OF LOSS IMMA-
TERIAL.—Where there was a relinquishment of control over the per-
manent investment by the guardian by leaving the bank book in the
control of a surety company which was sole surety on the guardian's
bond, .so that the guardian could make no draft upon the fund with-
out its consent, the guardian thereby became a guarantor of the
fund, irrespective of his motive or of whether his surrender of con-
trol was the cause of the loss of the fund. Where the loss occurred
through failure of the bank, the court will not inquire, in determin-
ing the liability of the guardian, whether such loss was due to his
abdication or control of the investment.

ID.—DUTY OF GUARDIAN TO CONTROL FUND—WITHDRAWAL ON INDICA-
TION OF DANGER.—It was the duty of the guardian, as trustee of the
investment fund, to retain absolute control thereof, and to with-
draw the money from the bank upon the slightest indication of dan-
ger or loss. He cannot perform his duty promptly if he is clogged
by the necessity of procuring the concurrent action of other persons.

ID.—CONTROL OF TRUST FUND BY SURETY DEPENDENT ON SANCTION OF
LAW.—It is held that if it be desired to provide some method by
which a surety company may have some control of a trust fund as
to which it has merely become surety for an officer of the court, such
as a guardian or administrator, to whom the court has given such
fund in charge, the method must be provided by the legislative de-
partment of the government; for the law, as it now stands in this
state, does not authorize it.

APPEAL from a decree of the Superior Court·of Monterey
County settling the final account of a guardian. B. V. Sar-
gent, Judge.

The facts are stated in the opinion of the court.

Heller, Powers & Ehrman, P. E. Zabala, Alfred G. Skaife,
and B. F. Cator, for Appellant.

Wyckoff & Gardner and C. F. Lacey, for Respondent.

ANGELLOTTI, J.—This is an appeal by William R. Taylor,
the guardian of the person and estate of Bennett Wood, a
minor, from that portion of the decree settling and allowing
his final and supplemental account which denies him credit
for $7269.53, money of the minor which had been deposited by
such guardian in the bank of the California Safe Deposit and
Trust Company of San Francisco, and which was on deposit

in said bank at the time of its failure in October, 1907. Appellant was appointed guardian of the estate of this minor and the estates of James Cleveland Wood and Hazel May Wood, minors, by the superior court of Monterey County, in March, 1903. He himself was a resident of Monterey County, as also were his attorneys. The property of his wards, consisting of money received from an estate in Illinois, aggregated $19,176.68, each minor owning one third. This money having been brought from the east, appellant deposited the same in the year 1903 in three San Francisco banks, the share belonging to Bennett Wood being deposited in the California Safe Deposit and Trust Company to the credit of "Wm. R. Taylor, guardian." No order of court was ever obtained authorizing this deposit to be made. The guardian was himself unacquainted with the standing of San Francisco banks, and apparently relied on the selection of a place of deposit entirely on his attorney, Mr. Wyatt, and the Pacific Surety Company, his sole bondsman, as guardian.

The deposit was one upon interest and was what is known as an ordinary savings bank deposit as distinguished from a term deposit, and it was made in such a manner that money could be withdrawn only upon the signatures of the surety company and the guardian, the bank book delivered to the guardian containing the provision: "Checks to be countersigned by the Pacific Surety Co." This book was kept in the possession of the surety company in San Francisco. The effect of this arrangement was to give the surety an effectual veto power over any attempted withdrawal of any of the money on deposit. Not a dollar could be drawn by the guardian without the concurrence of the surety company. The practice of the parties in withdrawing money was for the guardian or Mr. Wyatt to forward the guardian's check from Monterey County to the surety company in San Francisco, and the agent of the company would countersign such check, collect the money from the bank, and forward it to the guardian or his attorney.

The money, with the accretions of interest, less such small amounts as were drawn from time to time for expenses and the support of the minor, continued on deposit with such bank until the time of its failure in October, 1907, at which time it amounted to $7,269.53. In January, 1907, the National Surety Company was substituted as bondsman for the guar-

dian, the account not being changed in any way save that the
custody of the bank book was given to the new bondsman, and
the right to countersign changed from the old bondsman to
the new.

The evidence was sufficient to support a conclusion that the
guardian made practically no inquiry as to the standing of this
bank after the opening of the account, taking it for granted
that it was perfectly safe. In this he was apparently relying
entirely on Mr. Wyatt and the surety company.

The evidence was likewise sufficient to support a conclusion
that the money was deposited in this bank as a permanent in-
vestment, rather than as a mere temporary deposit for safe
keeping until a permanent investment could be found. There
was nothing to indicate that the guardian did not consider his
full duty and responsibility discharged in the matter of invest-
ing this money when he had once deposited it with the Cali-
fornia Safe Deposit and Trust Company.

As is said in respondent's brief, none of the recitals made in
papers filed in the guardianship proceedings brought the mat-
ter of the deposit to the attention of the superior court in such
a manner as to make it an object of inquiry or adjudication
so as to amount to leave or ratification by the court. The
action of the guardianship court which will protect a guardian
in the matter of investments (see Code Civ. Proc., sec. 1792;
*Guardianship of Cardwell,* 55 Cal. 141; *Estate of Schandoney,*
133 Cal. 387, [65 Pac. 877]), must be an action had under such
circumstances as show a bringing of such matter to the atten-
tion of the court for an adjudication thereon. The record
does not compel the conclusion that orders of the guardian-
ship court authorizing the withdrawal of small amounts needed
from time to time for expenses in support of the minor, indi-
cated any permanent deposit anywhere. There is absolutely
nothing to indicate that the guardianship court had any notice
of any arrangement under which the surety company had any
control over the money of the minor.

The California Safe Deposit and Trust Company was doing
a general banking business, and at the time of its failure had a
very large number of depositors. One of the witnesses testified
that the deposits aggregated nine million dollars, and that
among the depositors were some "of the very large business
men of San Francisco." The only evidence affording ground

for the conclusion that it was considered at all unsafe was that given by persons engaged in the banking business in Santa Cruz County and Monterey County, to the effect that it was looked upon with considerable concern as doing an unsafe business in the matter of loans and special inducements offered depositors, and as being "the weak member in the banking business of San Francisco." The closing of its doors by the bank in October, 1907, was without notice and entirely unexpected by the general public.

There is absolutely nothing in the record to impugn the good faith of the guardian in the matter of this deposit. He undoubtedly believed, with such limited knowledge as he had, that the bank was safe.

The main question on this appeal is as to the liability of the guardian to his ward upon these facts, for the money lost by the failure of the bank.

It is universally held that the measure of care and diligence required of a guardian or similar trustee is such as would be exercised by a man of ordinary prudence and skill in the management of his own business. (See Pomeroy's Equity Jurisprudence, sec. 1070; *Estate of Law,* 144 Pa. St. 499, [22 Atl. 831, 14 L. R. A. 103.]

The necessity of temporarily depositing trust funds in a bank for safe keeping is recognized, and it is settled law that if a trustee, for the purposes of such temporary deposit, exercises the degree of care above stated in the selection of a bank, and so earmarks the deposit as to show its trust character, he is not responsible in the event of the failure of the bank. (See Woerner American Law of Guardianship, secs. 62, 63.) But exercise of this degree of care in the selection of a bank for the deposit of trust funds is not necessarily sufficient to protect the trustee in the event of the failure of the bank.

If he deposits the money in his individual name without any designation or indication of his representative character, he is generally liable in the event of loss, notwithstanding that he has not been guilty of any negligence. (See *In re Arguello,* 97 Cal. 196, [31 Pac. 937]; *In re Bane,* 120 Cal. 533, [65 Am. St. Rep. 197, 52 Pac. 852].) This rule finds its warrant in the fact that the trustee "would be otherwise able to play fast and loose with his *cestui que trust,* and throw the

hazards of his own business on them, by designating the fund in which the loss has fallen as theirs, whether it was or was not so in reality" (see *In re Bane,* 120 Cal. 536, [65 Am. St. Rep. 197, 52 Pac. 852]), and in the theory that public policy forbids that the trustee under such circumstances should be permitted to claim that the lost property was trust property, rather than his own, as he had voluntarily caused it to appear.

Likewise, it appears to be in accord with many authorities that, *in the absence of an order of court permitting it,* such a deposit of trust funds in bank is not warranted as an investment, but only for temporary purposes pending investment, such a deposit as an investment being held to be a loan to the bank on personal security only, a kind of investment not considered by such authorities as one ordinarily proper to be made in the exercise of due care. (See Perry on Trusts, sec. 443; *Estate of Law,* 144 Pa. St. 499, [22 Atl. 831, 14 L. R. A. 103]; *Murph* v. *McCullough,* 40 Tex. Civ. App. 403, [90 S. W. 69].) Mr. Woerner, in his American Law of Guardianship, declares it to be a rule of almost universal application to trustees, particularly where minors are concerned, that trust funds shall not be loaned on personal security, and that a guardian is liable to make good all losses arising in consequence of loaning the ward's money without any security. He says that permanent deposits in banks as investments are held to be loans on personal security only, and should not be made except by leave of the guardianship court. A distinction is drawn between a temporary deposit of the ward's money for safe keeping, subject to the demand of the depositor, which case constitutes an exception to the general rule making trustees liable for the loss of trust funds invested on personal security, and a loan constituting an investment of the ward's funds. (Sec. 63.) We do not consider it necessary here to definitely decide whether the rule enunciated by these authorities is the true rule, or whether the facts of this case render the guardian liable thereunder on account of the deposit in question. It may be said, however, that in view of the authorities it would appear to be always advisable for a guardian desiring to make this character of investment to bring the matter before the guardianship court and to act only upon authorization therefor given by such court.

There is another rule sustained by the authorities that appears to us to settle the question of the guardian's liability. That rule is well stated in the syllabus to *McCollister* v. *Bishop*, 78 Minn. 228, [80 N. W. 1118], as follows: "If a trustee enters into any arrangement with reference to trust funds which surrenders or limits his control over them, he becomes a guarantor of the fund, irrespective of his motive or whether his surrender of control was the cause of the loss of the fund." In such a case, in the event of loss of the fund, the court will not enter upon an inquiry whether the loss is due to such abdication of control. While the court there held that the facts of that case did not bring it within this rule, it upheld the principle therein stated as an eminently salutary rule. The same principle was declared by the United States supreme court in *Forsyth* v. *Woods*, 11 Wall. 484, 487, [20 L. Ed. 207], where the court said: "Letters of administration are a trust. They are granted by the probate court, or ordinary, because of confidence reposed in the grantee. They require him to take exclusive charge of the personal property of his intestate, and to bring to its administration his own personal attention and judgment. He has no right to allow others to control it or to share in its administration. If he does, he exposes it to unnecessary hazards and subjects it to the disposition of persons in whom the officer of the law has reposed no confidence." Such limitation on the control of the trust property by the trustee as is shown by the facts of this case has been considered at great length in at least two cases, and in each case the conclusion was reached that such a limitation was prohibited by this rule. In Perry on Trusts, section 443, we find it declared that if the trustee deposits trust money "in such manner that it is not under his own exclusive control, as where money is deposited in bank so that it cannot be drawn without the concurrence of other persons, the trustee will be liable for the failure of the bank, on the principle that it is the duty of the trustee to withdraw the money from the bank upon the slightest indication of danger or loss, and he cannot perform his duty promptly if he is clogged by the necessity of procuring the concurrent action of other persons." The leading case in England of *White* v. *Baugh*, 3 Clark & Fin. 44, 6 Eng. Reprint, 1354, and the case of

*Fidelity and Deposit Co.* v. *Butler,* 130 Ga. 225 [60 S. E. 851, 16 L. R. A. (N. S.) 994], in each of which the facts, in all respects material to the question under consideration, were the same as those in the case at bar, and in each of which the rule above declared was held applicable, show reasons for the rule additional to that given in the above quotation from Perry on Trusts. The reasons for the rule stated in those decisions are substantially stated in respondent's brief, being that such an arrangement is contrary to public policy, as incompatible with the absolute control which court and guardian should have at all times over the fund in order to preserve it, as placing temptation in the way of officers of surety companies in no way under the jurisdiction of the court to obtain favors from weak banks in return for the bestowal or continuance of deposits, as hindering the guardian from seeking more favorable investments of the funds, and as being, in effect, a pledge of the fund to obtain the bond required by law. The discussion by Lord Brougham and Lord Lyndhurst in *White* v. *Baugh,* 3 Clark & Fin. 44, 6 Eng Reprint, 1354, and the exhaustive opinion of Justice Lumpkin in *Fidelity etc. Co.* v. *Butler,* in which all of the authorities on the question are reviewed and discussed, satisfy us that the rule forbidding the surrender by a trustee of his control over trust funds, on penalty of becoming a guarantor of the fund, an eminently salutary rule, applies to such an arrangement between the guardian and his surety as is shown by the evidence in this case. No authority in conflict with these views has been cited or found by us, and we know of no reasonable ground for a material distinction between such a limitation on the guardian's control of the trust fund as is shown by the facts herein, and the case of a trustee parting altogether with such control. As substantially said in *Fidelity etc. Co.* v. *Butler,* the effect of such an arrangement is to give a surety a complete veto power in the matter of any proposed change of a place of deposit, no matter what circumstances may arise. Whether this arrangement could be enforced or not as between the guardian, the surety and the bank, it did limit and impede the actual control of the fund in such manner as to bring it within the operation of a rule that is thoroughly established and that appears to us to rest upon sound considerations of public policy. If it be desired to provide some

method by which a surety company may have some control of a trust fund as to which it has merely become surety for the officer of a court, such as a guardian or administrator, to whom the court has given such fund in charge, the method must be provided by the legislative department of the government, for the law as it now stands in this state does not authorize it.

Our conclusion on this point renders it unnecessary to consider any of the alleged errors in the matter of the admission of evidence, for none of them affects the question under consideration, the evidence on that point being entirely without conflict.

The decree appealed from is affirmed.

Shaw, J., and Sloss, J., concurred.

Hearing in Bank denied.